<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARVIN P.R.,[1] <br><br> Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL SECURITY, <br><br> Defendant. | No. 24cv10608 (EP) <br><br> **OPINION** |

**PADIN**, District Judge.

Plaintiff Marvin P.R., who suffers from various physical impairments, appeals from the Social Security Administration's ("SSA") denial of disability insurance benefits ("DIB") pursuant to the Social Security Act, 42 U.S.C. § 401 (the "Act"). D.E. 1 (the "Appeal"). The Court has considered the parties' submissions and decides Marvin's Appeal without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **GRANT** the Appeal, **VACATE** the denial, and **REMAND** for further proceedings consistent with this Opinion.

**I.   BACKGROUND**

   **A.   Factual Background[2]**

Marvin P.R. was born in 1977. *See* D.E. 4 ("R.")[3] at 213-14. Sixth grade is the highest

---

[1] To protect the privacy interests of plaintiffs in social security cases, the Court adopts the recommendation of the Judicial Conference of the United States to refer to plaintiffs in social security cases by their first name and last initial. *Veronica D. v. Comm'r of Soc. Sec.*, No. 24-1326, 2025 WL 2665313, at *8 (M.D. Pa. Sept. 17, 2025).

[2] The Court predominantly focuses on the diagnoses and treatment Ramirez received as they relate to his dizziness, a medical issue that the ALJ did not adequately consider. Because the ALJ appears to have properly considered Marvin's other medical issues, this section does not recount in detail the treatment Ramirez received for those other extensive medical injuries.

[3] The Court cites to the Administrative Record as "R."

level of education he has completed.  *Id.* at 298.  While employed as a truck driver, Marvin suffered a six-foot fall onto concrete on January 7, 2019.  *Id.* at 29, 52-53.  Marvin suffered cervical and thoracic spinal fractures, a skull fracture, an ethmoid bone (bone between the eyes) fracture, traumatic brain injury, traumatic subdural hemorrhage, concussion, loss of consciousness, abrasions of the left shoulder and lower left leg, and lacerations across his left eyebrow and left eyelid.  *Id.* at 559-61.  MRI and CT imaging confirmed Marvin's fractures, along with Chiari I Malformation, multilevel cervical spondylosis, bone marrow edema, and spinal defects.  *Id.* at 565-66, 602.

While in the hospital, Marvin was placed under the care of a trauma team and underwent surgery, led by Dr. Ramakrishnan, to address the numerous fractures and subdural hematoma he suffered from the fall.  *Id.* at 584-87.  After spending five days in the hospital, Marvin left on January 11, 2019 and immediately began three weeks of inpatient treatment at the Kessler Institute for Rehabilitation.  *Id.* at 409, 496.  Examinations at Kessler revealed, among other things, impaired coordination and impaired balance, and Marvin's need for assistance with various daily living activities.  *Id.* at 420-27, 438.

Following Marvin's discharge from the hospital and from inpatient therapy, Marvin continued to obtain treatment from orthopedists, optometrists, neurologists, physical therapists, otolaryngologists, and a neuro-ophthalmologist.  For example, Marvin began seeing Dr. Robinson for neurological treatment in March 2019 to treat his back pain, neck pain, shoulder pain, headaches, dizziness, nausea, photophobia, and insomnia.  *Id.* at 496.  Over the course of his treatment, Dr. Robinson noted that Marvin continued to suffer various symptoms, including severe dizziness.  *Id.* at 493.  Dr. Robinson recommended vestibular rehabilitation in August 2019 to improve Marvin's dizziness and balance issues.  *Id.*  Two months later, despite Marvin's continued

dizziness, Dr. Robinson concluded that further treatment would not be curative, and that Marvin had reached maximum medical improvement. *Id.* at 492

Around the same time, Marvin also began seeing Dr. Bernstein for orthopedic treatment. *Id.* at 461. Dr. Bernstein concluded that Marvin's pain, weakness, and diminished sensation were symptoms of his spinal injury, rather than symptoms of any shoulder injury. *Id.* at 463. Marvin also sought treatment in April 2019 from an ophthalmologist, Dr. Goldfeder, for his blurred vision, dizziness, headaches, photophobia, and eye pain. *Id.* at 636. Dr. Goldfeder noted that at least Marvin's headaches may have been caused by his head injury. *Id.* at 638.

In April 2019, Marvin also received treatment from a neuro-ophthalmologist, Dr. Vicci. *Id.* at 648. Dr. Vicci recommended prism lenses, vestibular therapy, and myofascial and craniosacral therapy to help Marvin with his severe dizziness and vestibular dysfunction. *Id.* at 643, 651, 659-61. Throughout Marvin's treatment, Dr. Vicci noted Marvin's dizziness was constant and that its severity fluctuated based on certain activities like walking or head rotations. *Id.* Dr. Vicci ultimately diagnosed Marvin in 2020 with visual-vestibular integration dysfunction, cervicogenic-vestibular dysfunction, binocular vision dysfunction, and photophobia. *Id.* at 666-72. In other words, the brain and spinal injuries Marvin suffered were causing an imbalance between visual inputs and vestibular inputs. *Id.* at 666. This visual-vestibular integration dysfunction drove Marvin's headaches, balance issues, and difficulty processing repetitive motions. *Id.* Marvin's cervicogenic-vestibular dysfunction drove his photophobia, which further aggravated his dizziness, headaches, eye strain, and impacted near vision tasks. *Id.* at 666-72.

In May 2019, Marvin began outpatient physical therapy. *Id.* at 473. There, his physical therapists worked to restore Marvin's functional balance and to improve his other symptoms and

conditions. *Id.* at 475. His assessments there evaluated how Marvin's pain and dizziness prevented him from daily living activities like driving and putting on pants. *Id.* at 486-87.

Marvin also attended physical therapy with Dr. Scherl in March 2020. *Id.* at 503. Dr. Scherl also diagnosed Marvin with central vestibular vertigo, head trauma, concussion syndrome, and asymmetrical hearing loss. *Id.* at 506. Dr. Scherl noted that based on Marvin's neurological and ophthalmological treatment, he suspected Marvin's perpetual dizziness—which Marvin felt even while seated—stemmed from vestibular dysfunction. *Id.* at 503. Dr. Scherl recommended that Marvin follow up with a neurologist, neuro-ophthalmologist, and like Dr. Vicci, also recommended vestibular therapy. *Id.* at 506.

At Dr. Vicci's direction in 2021, Marvin returned to Kessler Rehabilitation for more physical therapy to improve his pain and dizziness. *Id.* at 678, 700. Marvin rated the severity of his dizziness at a seven out of ten and noted it worsened while walking and when straining his eyes. *Id.* at 681. Marvin noted that sitting in a recliner was helpful. *Id.* Physical therapists at Kessler noted Marvin's vertigo, impaired gait, and worsened dizziness after an eye exam. *Id.* at 691.

At Dr. Vicci's instruction, Marvin also followed up with his neurosurgeon, Dr. Ramakrishnan, in 2021 to determine whether his dizziness was related to his Chiari Malformation. *See id.* at 527. Dr. Ramakrishnan noted that although Marvin "has come a long way" he "still suffers from debilitating [dizziness], blurred vision and intermittent headaches." *Id.* Dr. Ramakrishnan referred Marvin to experts at Advanced Neurosurgery Associates to further investigate whether his dizziness was related to his Chiari Malformation or to his head injury. *Id.* at 528. While receiving treatment there, physicians noted that Marvin's dizziness persisted but ultimately opined that surgery to treat his Chiari Malformation was not appropriate. *Id.* at 754,

762. Instead, those physicians concluded that Marvin's dizziness was driven by the head injuries he sustained because of the fall. *Id.* at 755.

    **B.**    **Procedural Background**

On February 17, 2021, Marvin filed applications for DIB and for Supplemental Security Income. R. at 213. His applications alleged that since his fall on January 7, 2019, he has been unable to work due to neck injuries, back injuries, brain injuries, arm injuries, Chiari Malformation, and post-concussive syndrome. *Id.* at 297. The SSA initially denied Marvin's applications on June 22, 2021, and again upon reconsideration on January 11, 2022. *Id.* at 96, 108. Marvin then requested a hearing, which Administrative Law Judge ("ALJ") Dina Loewy conducted on June 28, 2022 (the "Hearing"). *Id.* at 43. The ALJ issued an unfavorable decision on August 10, 2023. *Id.* at 18.

Marvin appealed the ALJ's decision to the SSA Appeals Council, which denied review on May 29, 2024. *Id.* at 1. Marvin filed this appeal on November 20, 2024. Compl. Marvin's brief followed. D.E. 9 ("Brief"). The Commissioner of the SSA opposes. D.E. 11 ("Opp'n"). Marvin replies. D.E. 12 ("Reply").

    **C.**    **The ALJ's Decision**

To qualify for DIB, a claimant must show he is disabled within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E). Disability is the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The medically determinable impairment must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his

age, education, and work experience, engage in any other substantial gainful work that exists in the national economy.  *Id.* § 423(d)(2)(A).

The ALJ followed the five-step sequential evaluation procedure for determining whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  Claimants bear the burden of proof at steps one through four while the Commissioner bears the burden of proof at step five.  *Smith v. Comm'r Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010).  At step one, the ALJ determines whether the claimant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  Here, the ALJ found that Marvin had not engaged in substantial gainful activity since his fall on January 7, 2019.  R. at 26.

At step two, the ALJ decides whether the claimant has a "severe impairment" or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. § 404.1520(c).  Here, the ALJ found that Marvin suffered from the following severe impairments:  post-concussive syndrome, Chiari Malformation, cervical spine injury, and with his post-surgery status.  R. at 27.  The ALJ did not find that Marvin suffered mental health impairments and rejected evidence that Marvin suffered from severe blurry vision or severe headaches.  *Id.*

At step three, the ALJ decides whether the claimant's impairments meet or equal the severity of an impairment in the Listing of Impairments found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d).  If so, the claimant is presumed to be disabled if the impairment(s) has lasted or is expected to last for a continuous period of at least twelve months.  *Id.* § 404.1509.  Otherwise, the ALJ proceeds to step four.  Here, the ALJ found that Marvin did not have a physical impairment or combination of physical impairments that met or medically equaled the severity of any listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1.  R. at 27.

At step four, the ALJ must determine what the claimant's residual functional capacity ("RFC") is and whether the claimant can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the claimant is unable to perform past relevant work, the ALJ proceeds to step five. Here, the ALJ found that Marvin could not perform his past relevant work and that he had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) with the following limitations:

> occasionally lifting and/or carrying 10 pounds and less than 10 pounds frequently; standing and/or walking with normal breaks for up to 2 hours total for both in an 8 hour workday; sitting with normal breaks for 6 hours in an 8 hour workday; he can occasionally stoop, crouch, or kneel; he can never crawl; he can occasionally climb ramps or stairs; he can never climb ladders, ropes, or scaffolds; he can frequently reach, handle, finger, and feel; he can occasionally reach overhead with the right upper extremity; he needs to avoid all exposure to hazardous machinery, unprotected heights and operational control of moving machinery; and can tolerate moderate noise.

R. at 28, 35.

At step five, the ALJ must determine whether the claimant can perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(g). ALJs usually make this determination with the assistance of vocational expert ("VE") testimony. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201-02 (3d Cir. 2019). VE examination "typically involves 'one or more hypothetical questions posed by the ALJ to [a] vocational expert.'" *Id.* (quoting *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). The ALJ's questions to the VE must accurately reflect the claimant's impairments. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). The VE will then provide testimony regarding whether, given the claimant's physical capabilities, he can perform certain jobs listed in the Dictionary of Occupational Titles ("DOT"). *See Maria B. v. Kijakazi*, No. 21-2009, 2022 WL 17733680, at *2 (D.N.J. Dec. 16, 2022). If the claimant is unable to perform those jobs, he is presumed to be disabled if his impairments have lasted or can be

7

expected to last over a continuous period of at least twelve months. *N.M. v. Comm'r of Soc. Sec.*, No. 23-1093, 2024 WL 1006288, at *2 (D.N.J. Mar. 8, 2024).

At the Hearing, the ALJ determined that given Marvin's age, education, work experience, and RFC, he could perform jobs that exist in significant numbers in the national economy. R. at 35. Accordingly, the ALJ determined that Marvin was not disabled within the meaning of the Act. *Id.* at 36-37.

## II. LEGAL STANDARD

Judicial review of an SSA determination is based upon the pleadings and the transcript of the record. The scope of that review is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the ALJ's findings of fact. *See* 42 U.S.C. § 405(g) ("The findings . . . as to any fact, *if supported by substantial evidence*, shall be conclusive." (emphasis added)); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999) ("[W]e have plenary review of all legal issues . . . and review the ALJ's findings of fact to determine whether they are supported by substantial evidence.").

"Substantial evidence has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)). A "single piece of evidence," however, "will not satisfy the substantiality test if the Commissioner ignores, or fails to resolve, a conflict created by countervailing evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

If faced with conflicting evidence in the Record, the Commissioner "must adequately explain in the record his reason for rejecting or discrediting competent evidence." *Kirby v.*

*Comm'r of Soc. Sec.*, No. 16-5159, 2017 WL 4330361, at *5 (D.N.J. Sept. 29, 2017) (quoting *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987)). The Court must determine "whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision." *Dunster v. Dudek*, No. 24-469, 2025 WL 622333, at *4 (M.D. Pa. Feb. 26, 2025) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)). An ALJ's finding must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). Decisions with conclusory findings or which indicate the ALJ failed to consider all the evidence are not supported by substantial evidence. *See id.* at 705-06. The Court must also ensure the ALJ did not "reject evidence for no reason or for the wrong reason." *Id.* at 706 (citing *King v. Califano*, 615 F.2d 1018 (4th Cir. 1980)).

### III.     REVIEW OF THE ALJ'S OPINION

Marvin contends that at step four, the ALJ did not properly and fully consider the record before her. Brief at 22-23. Marvin specifically points to the abundance of evidence documenting his dizziness, which he contends precludes even sedentary work. *Id.* at 26-33. Because the Court agrees that the ALJ did not adequately consider and weigh the evidence before her regarding Marvin's dizziness in her assessment of Marvin's RFC, this Court will **GRANT** Marvin's Motion, **VACATE** the ALJ's denial of benefits, and **REMAND** for further proceedings consistent with this Opinion.

#### A.     Step Four

At step four, "the ALJ must determine whether a claimant's residual functional capacity enables h[im] to perform h[is] past relevant work." *Burnett*, 220 F.3d at 120. This analysis requires making factual findings regarding what the claimant's RFC is and whether he is able to perform

9

"sedentary," "light," "medium," "heavy," or "very heavy" work. *Id.* (citing 20 C.F.R. §§ 404.1561, 404.1567). While the ALJ adequately evaluated significant aspects of Marvin's medical record, her determination of Marvin's RFC did not incorporate the limitations he faces due to his dizziness.

A claimant's RFC is the work that "an individual is still able to do despite the limitations caused by his or her impairment(s)." *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999) (citing 20 C.F.R. § 404.1545(a)). In determining what a claimant's RFC is, "the ALJ must consider *all* evidence before [her]." *Burnett*, 220 F.3d at 121 (emphasis added). While the ALJ may find evidence unpersuasive, the ALJ must explain her reasons why. *See Plummer*, 186 F.3d at 429. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. Here, the record is replete with evidence that Marvin suffered from persistent dizziness but the ALJ's findings, while otherwise thorough, did not address either the credibility of those symptoms or their impact on Marvin's RFC. Because the ALJ did not adequately address Marvin's dizziness, her conclusion regarding Marvin's ability to perform sedentary work lacks a complete foundation.

> 1. *Medical evidence substantiates the persistency and severity of Marvin's dizziness*

"Where medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." *Mason v. Shalala*, 994 F.2d 1058, 1068 (3d Cir. 1993) (quoting *Carter v. R.R. Ret. Bd.*, 834 F.2d 62, 65 (3d Cir. 1986)).

At the Hearing, Marvin testified that his "biggest complaint" was that "at all times" he suffered from dizziness. R. at 55. Marvin testified that his dizziness symptoms "never g[o] away." *Id.* at 58. Marvin also testified that due to his dizziness, he has trouble "sitting straight" for longer than fifteen minutes but can sit in a recliner for "a lot longer than that." R. at 55-56. Because

Marvin's complaints regarding the persistency and severity of his dizziness symptoms were consistently corroborated by the medical record, the ALJ was required to give Marvin's complaints great weight in the absence of contradictory medical evidence.

For example, in January 2019, Marvin reported feeling "so dizzy" while receiving physical therapy at the Kessler Institute for Rehabilitation. *Id.* at 434. At this visit, the physical therapist noted Marvin felt "severe dizziness in sitting and standing" and exhibited "poor tolerance to sitting" due to "significant dizziness." *Id.* at 435; *see also id.* at 436 (noting dizziness in wheelchair); *id.* at 438 (noting impaired balance as a problem for Ramirez).

Later in June 2019, at an assessment at Alliance Hand & Physical Therapy, Marvin's service providers noted both his subjective complaints about dizziness and noted in their assessments that Marvin could not drive or put his own pants on because of his dizziness. *Id.* at 487-88. Over the next few years, Marvin's medical providers continued to assess and document his dizziness. *See id.* at 493 (neurologist assessment reporting "ongoing vertigo which at times is disabling" in August 2019); *id.* at 503 (Marvin complaining that he felt "[p]erpetually dizzy even sitting in chair and not moving" in March 2020); *id.* at 527 (reporting that Marvin had "come a long way but still suffers from debilitating dizz[i]ness" in January 2021); *id.* at 690 (Marvin's physical therapist noting in February 2021 that Marvin often had to lie to down to minimize dizziness); *id.* at 543 (reporting that "dizziness limits all of [Ramirez's] activities" and that Marvin continued to complain of "dizziness" in November 2021); *id.* at 810-14 (neurological examination in June 2022 diagnosing Marvin with vestibular dysfunction and noting that Marvin deviated one foot to the right when marching in place with his eyes closed).

Marvin's neuro-ophthalmologist, Dr. Vicci—who Marvin received treatment from between May 2019 and September 2020—diagnosed Marvin with visual-vestibular integration dysfunction,

cervicogenic-vestibular dysfunction, binocular vision dysfunction, and photophobia. *Id.* at 42, 666-72. Dr. Vicci noted in 2020, that Marvin's dizziness symptoms continued to persist because his underlying vestibular dysfunctional conditions had yet to be successfully managed. *Id.* at 669. Follow up treatment with neurological experts recommended by Dr. Vicci attributed his persistent dizziness to the head injury he suffered in 2019. *Id.* at 755. Ultimately, however, those neurologists concluded that Marvin's symptoms could not benefit further from treatment. *Id.* at 769.

        2.    *The ALJ erred by failing to accord great weight to Marvin's dizziness symptoms*

The ALJ summarized the above portion of Marvin's medical history and noted that the record indicated that visual-vestibular integration dysfunction, cervicogenic-vestibular dysfunction, photophobia, and binocular vision dysfunction drove Marvin's dizziness. *Id.* at 31-32. The ALJ also noted testimony indicating that despite taking vestibular therapy at the Kessler Rehabilitation Center, no more could be done for Marvin's dizziness because of his brain injury. *Id.* at 29. Finally, the ALJ also stated that she considered the Third-Party Function Report submitted by Marvin's wife, which documented her observations of Marvin's struggles with his dizziness. R. at 34.

The ALJ nevertheless appears to have discredited all evidence of Marvin's dizziness based on his testimony that he sometimes "drives locally" and walks his children to school.[4] R. at 29. But the ALJ may not rely on her own lay opinion to find disregard corroborated medical evidence.

---

[4] The Commissioner argues that the ALJ's statement that Marvin's "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" was sufficient to wholesale support the ALJ's RFC determination. Opp'n at 7. As previously discussed, however, an ALJ's findings *must* be supported "by a clear and satisfactory explication of the basis upon which it rests." *Cotter*, 642 F.2d at 704. Conclusory explanations will not do. *Id.* at 705-06.

*Plummer*, 186 F.3d at 429.  Indeed, because Marvin's complaints of dizziness were corroborated by medical evidence (and by his wife), the ALJ was not free to discredit Marvin's dizziness in the absence of contradictory medical evidence.  *R.R. Ret. Bd.*, 834 F.2d at 65.  The record indicates that Marvin's local drives are limited to the four minutes it takes to get to the Kessler Rehabilitation Center.[5]  R. at 308-10.  Marvin's walks to school are also short.  His children's school is one block away from his home.[6]  *Id.* at 52-53.

Marvin's ability to drive locally for four minutes and his ability to walk his children to school a block away from home are not inconsistent with his inability to perform sedentary work for a full work day.  *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").  It was therefore error for the ALJ to disregard Marvin's dizziness.

Accordingly, the ALJ's judgment regarding Marvin's RFC is not supported by substantial evidence. [7]  *See Cotter*, 642 F.2d at 705 (explaining that factual findings should be "as comprehensive and analytical as feasible, and where appropriate, should include a statement of

---

[5] On a single occasion, Ramirez drove on the highway to a doctor's appointment that was further away but felt dizzy and disturbed during the drive.  R. at 670.  Because Ramirez could not safely drive home, his wife picked him up from his appointment.  *Id.*  There is no indication that Ramirez has attempted driving on the highway since.

[6] Ramirez also walks his eldest son to soccer practice.  It is not clear whether soccer practice is at school or at some other location.

[7] Ramirez mistakenly contends that the Commissioner mischaracterizes *Cotter* in its briefing by stating that its holding required the ALJ to only provide a brief explanation for its factual findings.  Reply at 3.  The Court notes, for Marvin's benefit, that sometimes, different cases may have the same name.  *See, e.g.*, *Cotter v. Harris*, 650 F.2d 481 (3d Cir. 1981); *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981).  Ramirez appears not to have recognized that the Commissioner did not mischaracterize *Cotter*.  The Commissioner simply cited a different case.  Nevertheless, the ALJ's brief explanation with respect to Marvin's dizziness is insufficient.

## IV.      CONCLUSION

Based on the foregoing, the Court will **GRANT** Marvin's appeal, **VACATE** the ALJ's denial of benefits, and **REMAND** to the SSA for further consideration of Marvin's dizziness and the impact it may have on his residual functional capacity and on his ability to engage in sedentary work.  Because further consideration of the evidence may impact the ALJ's analysis at both steps four and five, the Court will leave any challenges to those steps to the Commissioner on remand.  Accordingly, the Court remands this matter to the Commissioner for proceedings consistent with the Order.


Dated: December 28, 2025

       /s/ Evelyn Padin
Evelyn Padin, U.S.D.J.